IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**UNITED STATES OF AMERICA**,                    3:10-cr-00142-KI

             Plaintiff,

                         OPINION AND ORDER

    vs.

**LUIS PULIDO-AGUILAR**,

             Defendant.


    Dwight C. Holton
    United States Attorney
    District of Oregon
    Leah K. Bolstad
    Assistant United States Attorney
    District of Oregon
    1000 SW Third Avenue, Suite 600
    Portland, Oregon   97204

        Attorneys for Plaintiff

Jacob Wieselman
Wieselman Group
460 Fifth Street
Lake Oswego, Oregon   97034

      Attorney for Defendant

KING, Judge:

Defendant Luis Pulido-Aguilar was driving on Interstate 84 when an Oregon State Police

trooper pulled him over for a routine traffic stop.  When the trooper eventually searched

Pulido-Aguilar's pickup truck, he found five large packages of methamphetamine in a hidden

compartment.  Pulido-Aguilar is charged with possession with intent to distribute

methamphetamine, specifically involving 50 grams or more of a mixture or substance containing

a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and

841(b)(1)(B)(viii).  He moves to suppress items seized from his pickup truck on March 17, 2010,

along with items seized from his person, statements he made, and all evidence seized under the

authority of a search warrant obtained based on evidence illegally seized prior to the court issuing

the warrant.  For the following reasons, defendant's Motion to Suppress Physical Evidence and

Statements [24] is denied except for statements Pulido-Aguilar made after his arrest for giving

false information to a police officer and before he read his *Miranda* rights from a card.  I

suppress these statements.

## FACTS

The following facts were adduced at an evidentiary hearing:

Oregon State Police Trooper Kaipo Raiser was patrolling alone on Interstate 84 near

The Dalles, Oregon in a marked car on March 17, 2010.  Trooper Raiser is aware that this

PAGE 2 - OPINION AND ORDER

highway is a significant drug trafficking corridor.  He noticed a Dodge Ram pickup truck was

following too closely behind a motor home.  Trooper Raiser tracked behind the pickup for a mile

but the pickup did not pass and did not fall farther behind the motor home to a safe distance.  The

pickup was about one and one-half car lengths back but should have been seven car lengths back

for the 65 to 70 mile per hour speed it was traveling.  Trooper Raiser pulled the pickup over and

reported the stop to the dispatcher at 9:44 A.M.

Trooper Raiser approached the pickup truck, which had both a driver who could speak

English and a passenger who could not.  Trooper Raiser could smell a strong odor like laundry

soap and could see air fresheners which were not numerous enough to account for the strong

odor.  He also could see loose interior body panels, fast food bags and energy drink cans, two cell

phones, and an empty prescription pill container for Luis Pulido-Aguilar, but could not see any

luggage.  The pickup was in good condition, with brand new tires worth approximately $1,000.

The driver, defendant in this case, produced a California driver license for Victor

Pulido-Aguilar and registration for the pickup, in the name of Arcelia Diaz in Modesto,

California.  Both Pulido-Aguilar and his passenger had to search to find the registration.  They

produced it within five or six minutes after the traffic stop began.  Trooper Raiser did not

carefully compare Pulido-Aguilar with the picture on the driver license.

Pulido-Aguilar told Trooper Raiser that they were driving from California to Hermiston,

Oregon to look for work.  Pulido-Aguilar pulled a small duffel bag containing some clothes out

from behind the front seat.  The passenger had a small retail plastic bag with some clothes and a

new toothbrush.  Pulido-Aguilar did not know the full name of the registered owner of the pickup

and called her Luna Diaz.  The trooper did not know if Luna Diaz and Arcelia Diaz are the same woman.

Trooper Raiser asked Pulido-Aguilar to step out of the pickup and come to the back of it to talk to him.  The trooper did not have his gun drawn and described the conversation as relaxed at this point, with Pulido-Aguilar showing confidence.  Trooper Raiser asked Pulido-Aguilar if he had illegal drugs with him and Pulido-Aguilar said no.  He told the trooper to go ahead and search the pickup, and made a gesture sweeping his arm towards it.  To confirm, Trooper Raiser asked if he could search the pickup and Pulido-Aguilar said yes.

Oregon State Police policy does not allow a trooper working alone to search a vehicle until backup arrives.  Trooper Raiser asked the dispatcher to send backup at 9:51 A.M., seven minutes after the stop began.  He also checked the criminal history of Pulido-Aguilar and the car registration by 9:53 A.M.  Victor Pulido-Aguilar was not wanted and had no significant criminal history.  The car had not been reported stolen.

Trooper Raiser used gestures and a few words of Spanish to ask the passenger if he had any illegal drugs.  The trooper told the passenger that they were going to search the pickup and asked him to get out and move to the back with Pulido-Aguilar.  Trooper Raiser asked both men if they had any large sums of money.  The passenger had about $60.  Pulido-Aguilar pulled out some money but the trooper could see that there were still bulges in his clothes and asked him to show all of the money.  Pulido-Aguilar was reluctant to do so but eventually took between $600 and $700 out of his clothing.  Trooper Raiser patted down Pulido-Aguilar and found a single unpackaged pill in his pocket, which Pulido-Aguilar said belonged to his brother.

PAGE 4 - OPINION AND ORDER

The backup officer, Trooper Michael Holloran, arrived just after 10:00 A.M.  Trooper Raiser gave the pill to Trooper Holloran and asked him to identify it.  Trooper Raiser asked Pulido-Aguilar why his brother's pill bottle was in the car.  Pulido-Aguilar became nervous for the first time and said his brother must have accidently left it there.  They talked about the reason for the trip and Pulido-Aguilar said they would be picking apples.  The trooper informed Pulido-Aguilar that the apples would not be ready to pick for months.  Trooper Raiser told him that a drug-sniffing dog was on the way.  Pulido-Aguilar again said that they could search the pickup.  This was just after 10:00 A.M.

Trooper Raiser started the search.  In the passenger compartment, he found multiple state maps, the two active cell phones he had seen earlier, two nonworking cell phones, an aftermarket wire under the dashboard, vehicle fluid, a Phillips screwdriver, extra upholstery tabs, and an upholstery tool.  He could not find the source of the strong odor.  Trooper Raiser noticed that the door trim had been repainted.  In the engine compartment, the trim covering the wipers had a stripped loose screw and the insulation against the firewall had been pulled away.

Trooper Holloran reported back to Trooper Raiser that the pill was for a urinary tract infection.  He had also learned that Pulido-Aguilar and the passenger did not know each other's full names and called each other by nicknames.  Trooper Holloran also reported that Pulido-Aguilar did not match the picture on the driver license he produced for Victor Pulido-Aguilar.  In addition, Pulido-Aguilar had gotten very nervous, his hands were shaking, and he was pacing.

Trooper Raiser spoke to Pulido-Aguilar again and asked for his date of birth.  Pulido-Aguilar gave a date which matched the driver license but he gave his age as one year

PAGE 5 - OPINION AND ORDER

different from the license.  Trooper Raiser also realized that Pulido-Aguilar's height was several

inches different from what was stated on the license.

At 10:42 A.M., Trooper Raiser arrested Pulido-Aguilar for giving false information to a

police officer.  He handcuffed Pulido-Aguilar and put him in the back of a patrol car.  Trooper

Raiser then got Pulido-Aguilar's wallet from inside the pickup and pulled from the wallet many

documents for Luis Pulido-Aguilar.  Both troopers asked Pulido-Aguilar about the contents of his

wallet.  These inquiries consisted of only a few questions about Pulido-Aguilar's identity and no

questions about drugs or the search.  Trooper Raiser asked the dispatcher to check the criminal

history of Luis Pulido-Aguilar and found out that Luis Pulido-Aguilar had an extensive criminal

history, including two drug convictions, and a suspended license.

While Trooper Raiser left for a few minutes to use the restroom, Trooper Holloran told

Pulido-Aguilar that they were waiting for the drug-sniffing dog.  Pulido-Aguilar told the trooper

to keep searching because he didn't have any drugs.  He again swept his hand toward the pickup.

Trooper Raiser let the passenger leave on foot and directed him to the nearest business.

The trooper continued to search the pickup while he waited for the drug dog, which was en route

from another county.  The trooper was sure there was a hidden compartment which likely

contained drugs.

The drug-sniffing dog, Kilo, arrived with his handler at 11:20 A.M.  The handler lifted

Kilo to the top of the engine compartment and she alerted to the presence of drugs in the area

under the windshield by the firewall.  Trooper Raiser removed the trim in that area, first noticing

that it was missing a nut and was well worn.  He found a hole cut into the sheet metal behind a

box that is part of the car's equipment attached to the firewall.  Five packages of

methamphetamine were behind the hole, each weighing about one pound including the packaging. They were wrapped in multiple layers of plastic with transmission fluid to mask the odor. The tools and vehicle fluids the trooper found earlier in the passenger compartment matched the hidden compartment and drug packaging. Pulido-Aguilar never withdrew consent to search.

At about 11:40 A.M., Trooper Raiser told Pulido-Aguilar that he was under arrest for methamphetamine. He immediately had Pulido-Aguilar read his *Miranda* rights in Spanish from a card. The last question Pulido-Aguilar read said, in Spanish, "Do you understand each of these rights I have explained to you?" Ex. 28. Pulido-Aguilar immediately said, "Yeah" to indicate that he understood.

Trooper Raiser interviewed Pulido-Aguilar further in the patrol car. Pulido-Aguilar said that he was paid $1,000 to drive the drugs to Hermiston. Pulido-Aguilar was not willing to deliver the drugs acting undercover for the police because his family was heavily involved in drug trafficking. He did not want family members arrested, and he was concerned about their safety in regard to other drug traffickers.

Trooper Raiser interviewed Pulido-Aguilar further once they returned to the Oregon State Police office. Pulido-Aguilar admitted that he had lied about his name.

Trooper Holloran also interviewed Pulido-Aguilar at the office and asked him about the cell phones. Pulido-Aguilar said more than once they could look at and search the phones. The phones kept getting texts from Lamberto about $6,000.

///

///

PAGE 7 - OPINION AND ORDER

**DISCUSSION**

I.    Federal or State Law?

Pulido-Aguilar bases many of his arguments on Oregon's constitution and primarily cites

Oregon cases which interpret the state constitution.  The government argues that Oregon law

does not control the case.

No matter whether federal or state authorities seized the evidence, it will only be

excluded in federal court if it violates federal law and not if it is tainted solely under state

constitutional law.  United States v. Cormier, 220 F.3d 1103, 1111 (9th Cir. 2000); United States

v. Becerra-Garcia, 397 F.3d 1167, 1173 (9th Cir. 2005).  Two exceptions exist:  (1) the

reasonableness of an inventory search depends on the officer's compliance with state and local

procedures; and (2) the reasonableness of a search incident to arrest for a state law violation

depends on the legality of the arrest under state law.  Becerra-Garcia, 397 F.3d at 1173 n.3.

Neither exception comes into play here.  Accordingly, I will concentrate on federal cases

analyzing the United States Constitution.

II.    The Traffic Stop

    A.    The Initial Stop

Pulido-Aguilar argues the traffic stop was supported by neither reasonable suspicion nor

probable cause.

The government contends that Trooper Raiser had probable cause for the traffic stop

based on his observation of defendant violating ORS 811.485, Following Too Closely:  "A

person commits the offense of following too closely if the person does any of the following: . . .

Drives a motor vehicle so as to follow another vehicle more closely than is reasonable and

prudent, having due regard for the speed of the vehicles and the traffic upon, and condition of,
the highway." ORS 811.485(1)(a).

Trooper Raiser testified that Pulido-Aguilar drove more than a mile only one and one-half
car lengths behind the motor home when he should have been seven car lengths back for the
speed he was traveling. Probable cause existed that Pulido-Aguilar violated the traffic law.
"[T]he decision to stop an automobile is reasonable where the police have probable cause to
believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810, 116 S.
Ct. 1769 (1996). Thus, the initial traffic stop was lawful.

Moreover, the trooper did not violate the Constitution by asking the men to get out of the
pickup and move to the back of it. Pennsylvania v. Mimms, 434 U.S. 106, 111 n.6, 98 S. Ct. 330
(1977) (an officer making a lawful traffic stop may order the driver out of the car pending
completion of the stop without violating the Fourth Amendment); Maryland v. Wilson, 519 U.S.
408, 415, 117 S. Ct. 882 (1997) (an officer making a lawful traffic stop may order passengers out
of the car pending completion of the stop).

    B.    Consent to Search

Pulido-Aguilar contends the taint of the illegal detention made his consent to search
involuntary. He argues that he was not asked for consent until he was already questioned and the
original traffic violation was concluded.

The government argues that Pulido-Aguilar gave voluntary consent to search at three
different times: (1) less than eight minutes into the traffic stop and before Trooper Raiser asked
for consent; (2) after Trooper Raiser returned from the records check; and (3) after defendant was
arrested for providing false information.

PAGE 9 - OPINION AND ORDER

The government must prove that a consent to search is voluntary by a preponderance of the evidence.  United States v. Matlock, 415 U.S. 164, 177, 94 S. Ct. 988 (1974).  A consent given to search is valid if the consent was freely and voluntarily given and not the result of duress or coercion, express or implied.  Whether the consent given to search was freely and voluntarily given is a question of fact to be determined by the totality of the circumstances.  Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973).

The factors that a court considers in determining whether the consent to search was voluntary may include, but are not limited to:  (1) whether the defendant was in custody; (2) whether the arresting officer had his gun drawn; (3) whether *Miranda* warnings were given prior to the search; (4) whether the defendant was told he had the right to withhold consent; and (5) whether the officers claimed that they could obtain a search warrant.  United States v. Vongxay, 594 F.3d 1111,1119-20 (9th Cir.), cert. denied, 131 S. Ct. 294 (2010).  No one factor is dispositive and the fact that some of the factors are not established "does not automatically mean that consent was not voluntary."  United States v. Torres-Sanchez, 83 F.3d 1123, 1130 (9th Cir. 1996).  In particular, the lack of *Miranda* warnings is not dispositive of whether a consent to search was voluntary.  Id.

I first conclude testimony established that Trooper Raiser asked Pulido-Aguilar if he had illegal drugs, Pulido-Aguilar said no and told the trooper to go ahead and search the pickup, and the trooper confirmed that Pulido-Aguilar meant that the trooper could search the pickup, all by 9:51 A.M., about seven minutes after the stop began.  Pulido-Aguilar gave two additional consents to search the pickup:  (a) just after 10:00 A.M., when Trooper Raiser told him that a drug-sniffing dog was on the way; and (b) between 10:42 A.M. and 11:20 A.M., after the arrest

for false information when Trooper Holloran told Pulido-Aguilar they were still waiting for the dog. Pulido-Aguilar never withdrew his consent to search. Pulido-Aguilar gave the third consent to search in the interval during which I suppress all of his statements, for reasons explained below. Thus, I will not rely on the third consent.

I will concentrate on the first consent to search, occurring about seven minutes after the stop began. I will discuss the length of the stop more below, but there is no reasonable argument that Pulido-Aguilar was illegally detained seven minutes into the stop. I concluded above that there was probable cause for the stop, and Pulido-Aguilar and his passenger took five or six minutes to locate the pickup's registration. At the time of the first consent, Pulido-Aguilar was not illegally detained so I do not need to address whether his consent to search was tainted.

Turning to the factors, at the time of the first consent, Pulido-Aguilar was detained in an investigative stop but was not in custody from a de facto arrest. See Torres-Sanchez, 83 F.3d at 1128-30 (in an investigative stop to determine ownership of vehicle stopped for having no license plates, defendant was not under arrest when he consented to a search, even though officer had taken defendant to the front seat of the patrol car to question him out of the cold and defendant stayed in the patrol car for 20 minutes before the officer asked him for consent). Trooper Raiser did not have his gun drawn. The trooper had not given a *Miranda* warning but there was no need for it because Pulido-Aguilar was not yet arrested. Trooper Raiser did not warn Pulido-Aguilar that he could withhold consent and did not claim that he could get a search warrant. I also note that at this part of the traffic stop, Pulido-Aguilar was confident and the conversational tone was pleasant and unthreatening.

PAGE 11 - OPINION AND ORDER

Pulido-Aguilar's consent to search has all the appearances of a voluntary and freely-made decision with no evidence to the contrary.  I conclude that the government proved by a preponderance of the evidence that Pulido-Aguilar voluntarily consented to a search of the pickup.

      C.    <u>Length of the Stop</u>

Pulido-Aguilar argues the troopers extended the traffic stop past the point in time when the reason for the stop had dissipated.  Pulido-Aguilar argues that Trooper Raiser's stated reasons create a mere hunch that defendant was involved in drug trafficking and are inadequate to create reasonable suspicion to support an investigative stop.  According to Pulido-Aguilar, reasonable suspicion of drug trafficking did not arise until the drug dog alerted, about two hours after the stop began.  Even the probable cause that defendant provided false information to a police officer did not arise until the troopers detained Pulido-Aguilar for an hour.

The government contends that the extension of the traffic stop beyond the time needed to conduct a standard traffic stop was supported by the troopers' reasonable suspicion of criminal activity and their diligent investigation.  The government argues that Trooper Raiser's brief question about drugs did not unreasonably prolong the duration of the traffic stop because it took place no more than eight minutes into the stop and took only a few seconds to ask.  The government also notes that Trooper Raiser had observed several suspicious facts which buttress the reasonableness of his inquiry about drugs.

There are three types of police stops under the Fourth Amendment.  First, police may stop a citizen for questioning at any time, so long as a reasonable person would feel free to leave. <u>Florida v. Bostick</u>, 501 U.S. 429, 434, 111 S. Ct. 2382 (1991).  Such brief, "consensual"

exchanges need not be supported by a reasonable suspicion that the citizen is engaged in wrongdoing, and such stops are not considered seizures.  Second, the police may detain citizens for brief, investigative stops.  This class of stops is not consensual, and such stops must be supported by "reasonable suspicion," a lower standard than probable cause.  Terry v. Ohio, 392 U.S. 1, 20-22, 88 S. Ct. 1868 (1968).  Finally, police stops may be full-scale arrests.  These stops are seizures and must be supported by probable cause.  Whiteley v. Warden, 401 U.S. 560, 564-66, 91 S. Ct. 1031 (1971) (same probable cause standard applies for arrest warrant or warrantless arrest).

Pulido-Aguilar relies on United States v. Chavez-Valenzuela, 268 F.3d 719 (9th Cir. 1987), abrogated in part by United States v. Mendez, 476 F.3d 1077 (9th Cir. 2007).  The court in Chavez-Valenzuela relied on the law at the time that during a traffic stop, an officer must restrict questions to those reasonably related to the justification for the stop and can "expand their scope only if he notices particularized, objective factors arousing his suspicion."  Id. at 724 (holding that extreme nervousness, without other objective factors, does not support a reasonable suspicion of criminal activity).  The Ninth Circuit, however overruled that portion of Chavez-Valenzuela based on Muehler v. Mena, 544 U.S. 93, 100-101, 125 S. Ct. 1465 (2005).  "'[M]ere police questioning does not constitute a seizure' unless it prolongs the detention of the individual, and, thus, no reasonable suspicion is required to justify questioning that does not prolong the stop."  Mendez, 476 F.3d at 1080 (quoting Muehler, 544 U.S. at 101 (internal quotation marks omitted)) (noting that Muehler overruled Chavez-Valenzuela to the extent it holds that such questioning must be supported by separate reasonable suspicion).

PAGE 13 - OPINION AND ORDER

This is not the correct line of cases on which to base the analysis for Pulido-Aguilar's traffic stop, however.  Here, the troopers were conducting an investigative stop concerning drug trafficking.  As soon as Trooper Raiser approached the pickup, he could smell a strong odor like laundry soap which was not accounted for by the number of air fresheners in the pickup.  He also could see loose interior body panels but could not see any luggage.  Once the occupants pulled out their luggage, it was extremely minimal.  The car contained a lot of energy drinks and fast food bags, possibly indicating the occupants did not want to take the time to stop and eat.  The car was registered to another person, and the occupants had trouble locating the registration, even though they borrowed the car to drive from California to Washington to seek work.  The occupants did not know the full name of the registered owner.  Trooper Raiser also knew that this section of the interstate was a significant drug trafficking corridor.

All of these facts together create reasonable suspicion which allowed the troopers to conduct an investigative stop.  The question is whether the stop was prolonged in violation of the Fourth Amendment.

> Although the Supreme Court has recognized that some investigatory stops made under *Terry* may be reasonable even if they are longer than the "momentary one[ ]" involved in that case, "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion."
>
> We have held that the critical inquiry is whether the officers "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."

Liberal v. Estrada, 632 F.3d 1064, 1080 (9th Cir. 2011) (quoting United States v. Place, 462 U.S. 696, 709, 103 S. Ct. 2637 (1983), and United States v. Sharpe, 470 U.S. 675, 686, 105 S. Ct. 1568 (1985)).

PAGE 14 - OPINION AND ORDER

Within seven minutes, Pulido-Aguilar gave Trooper Raiser consent to search the pickup. For safety reasons, Oregon State Police policy requires a trooper working alone to wait for backup before conducting a search of a vehicle.  Trooper Holloran arrived after sixteen minutes. Trooper Raiser then began searching the pickup while Trooper Holloran interviewed Pulido-Aguilar and the passenger.

Trooper Raiser found four cell phones, an upholstery tool, extra upholstery tabs, repainted door trim and, within the engine compartment, he found a stripped screw attaching some trim and insulation that had been pulled away from the firewall.  Importantly, the trooper had not yet located the source of the strong odor.

Meanwhile, Trooper Holloran reported that Pulido-Aguilar and the passenger did not know each other's full names, that Pulido-Aguilar did not match the picture on the driver license, that Pulido-Aguilar did not give an age that matched the driver license, and that Pulido-Aguilar had gotten very nervous.  Additionally, the patient on the pill container did not match the name on the driver license and Pulido-Aguilar's story about the pill was confused.

Trooper Raiser confirmed this information and saw that Pulido-Aguilar's height did not match the driver license.  At 10:42 A.M., Trooper Raiser arrested Pulido-Aguilar for giving false information to a police officer.  This was just under an hour after the stop.  I also note that the troopers were pursuing this investigation while they awaited the arrival of the drug dog from the next county.  The troopers informed Pulido-Aguilar of the delay for the drug dog but he did not withdraw his consent to search.

I conclude that the troopers diligently pursued their investigation, resulting in the arrest of Pulido-Aguilar for giving false information and the end of the investigative stop.  Once

Pulido-Aguilar was arrested for the first crime, any possible Fourth Amendment violation for an illegal seizure ended. The investigative stop was reasonable in length. The troopers diligently searched for drugs, waited for the drug dog, questioned Pulido-Aguilar about his identity, and questioned both occupants about the purpose of the trip. The troopers did not violate Pulido-Aguilar's Fourth Amendment rights.

III.    The Statements

    A.    Miranda Warning

Pulido-Aguilar argues that all statements he made prior to the *Miranda* warning, given after the troopers arrested him for the drugs, should be suppressed because the troopers conducted a custodial interrogation which began when they ordered Pulido-Aguilar out of his pickup.

The government claims that *Miranda* warnings were not required during the investigatory interview.

I concluded above that the investigative stop was reasonable in length. The investigative stop terminated, and Pulido-Aguilar was seized under the Fourth Amendment, when the troopers arrested him at 10:42 A.M. for giving false information to a police officer. Until this time, the troopers were not conducting a custodial investigation so Pulido-Aguilar was not entitled to a *Miranda* warning. Torres-Sanchez, 83 F.3d at 1130 (*Miranda* warnings were not necessary when suspect gave consent to search during investigatory stop because suspect was not under a de facto arrest).

The government concedes, however, that the troopers' questions after the 10:42 A.M. arrest for false information violated Pulido-Aguilar's *Miranda* rights because he was in custody

PAGE 16 - OPINION AND ORDER

but not Mirandized before the questioning.  I agree and suppress these statements, which all

concern Pulido-Aguilar's true identity.

Pulido-Aguilar contends that the troopers did not advise him of his *Miranda* rights after

the false information arrest because they feared that doing so would result in his terminating the

consent to search or refusing to answer any further questions.  This is known as a two-step

interrogation, namely, interrogating to obtain a confession, giving a *Miranda* warning, and

interrogating again to obtain the same confession.

Thus, Pulido-Aguilar argues that the statements he made about the drugs, after the

troopers arrested him for the drugs and Mirandized him, should be suppressed as fruits of the

poisonous tree.  He contends that the troopers intentionally failed to give *Miranda* warnings after

the false information arrest and, when they finally did give *Miranda* warnings, the troopers did so

in an ineffective way because they could not tell if Pulido-Aguilar understood the Spanish

version of the warning he read out loud.

As evident in the analysis above, I do not agree with Pulido-Aguilar's contention that he

suffered a series of constitutional violations, beginning with the initial traffic stop.  The only

constitutional violation I have found so far was the *Miranda* violation after the false information

arrest.  Thus, I agree with the government that the analysis is controlled by United States v.

Williams, 435 F.3d 1148, 1157-58 (9th Cir. 2006), and its melding of Oregon v. Elstad, 470 U.S.

298 (1985), with Missouri v. Siebert, 542 U.S. 600 (2004), concerning two-step interrogations.

"[A] trial court must suppress postwarning confessions obtained during a deliberate

two-step interrogation where the midstream *Miranda* warning–in light of the objective facts and

circumstances–did not effectively apprise the suspect of his rights."  Williams, 435 F.3d at 1157.

PAGE 17 - OPINION AND ORDER

> [I]n determining whether the interrogator deliberately withheld the *Miranda* warning, courts should consider whether objective evidence and any available subjective evidence, such as an officer's testimony, support an inference that the two-step interrogation procedure was used to undermine the *Miranda* warning. . . . Such objective evidence would include the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and post-warning statements.

Id. at 1158-59.

Thus, the first issue I address is whether the troopers deliberately withheld the *Miranda* warning after arresting Pulido-Aguilar for giving false information to an officer. There is scant evidence of the troopers' subjective intent. Trooper Holloran testified that he was not trying to deliberately get around *Miranda*. Trooper Raiser testified that he did not know why he failed to Mirandize Pulido-Aguilar immediately after the false information arrest.

Turning to the objective factors, the continuity of the police personnel and the fact that both interrogations took place at the location of the traffic stop weigh in favor of deliberateness. One hour separated the interrogations. I consider that factor neutral. See United States v. Narvaez-Gomez, 489 F.3d 970, 974 (9th Cir. 2007) (change in setting and time span of about four hours between statements indicates a lack of deliberateness). The first interrogation was quite brief and incomplete, only a few minutes. That weighs in favor of a lack of deliberateness.

Most importantly, the content of the two interrogations did not overlap at all. The first concerned the false information charge and questions about identification documents the troopers located in Pulido-Aguilar's wallet. Drugs were not discussed at all in the first interrogation. The second interrogation was about the drugs just found. There is no evidence that during the second interrogation, the troopers referred to Pulido-Aguilar's prewarning statement. The third interrogation, at the Oregon State Police office, was even further separated in time and at a

completely different location.  It covered additional identity questions as well as text messages

coming into Pulido-Aguilar's cell phone.  Nothing about the third interrogation persuades me the

officers acted deliberately.

Weighing all the factors, I find that the troopers did not deliberately employ a two-step

interrogation technique to evade the import of the eventual *Miranda* warning.

If officers do not deliberately employ the two-step strategy, Elstad governs the

admissibility of postwarning statements.  Williams, 435 F.3d at 1158.  "[U]nder Elstad, if the

prewarning statement was voluntary (or if involuntary, the change in time and circumstances

dissipated the taint), then the postwarning confession is admissible unless it was involuntarily

made despite the *Miranda* warning."  Id. at 1153.  Thus, I need to determine if the statements

were voluntary.

The government must establish the voluntariness of a confession by a preponderance of

the evidence.  United States v. Haswood, 350 F.3d 1024, 1027 (9th Cir. 2003).  When

considering whether a confession is voluntary, the court determines whether, "considering the

totality of the circumstances, the government obtained the statement by physical or psychological

coercion or by improper inducement so that the suspect's will was overborne."  United States v.

Heller, 551 F.3d 1108, 1112 (9th Cir. 2009) (internal quotation omitted).  The court should

consider the length and location of the interrogation, the maturity and education of the defendant,

the physical and mental condition of the defendant, and whether the defendant was properly

advised of his *Miranda* rights.  Withrow v. Williams, 507 U.S. 680, 693-94, 113 S. Ct. 1745

(1993).

The troopers testified that the questioning of Pulido-Aguilar was quite relaxed at first, and again at the Oregon State Police office, and even included some joking around. There is no evidence of yelling or threats. Although the entire traffic stop took over two hours, the troopers questioned Pulido-Aguilar intermittently for brief periods. There is no evidence that any of the questioning periods lasted more than ten minutes. Two of the custodial interrogations took place in the back of the patrol car and a third was at the Oregon State Police office. One trooper removed the handcuffs temporarily from Pulido-Aguilar so that he could go to the bathroom behind the patrol car. There is no evidence that Pulido-Aguilar had any physical or mental condition which would affect his will. Pulido-Aguilar displayed a lot of confidence until the troopers located the drugs in the hidden compartment, at which point he became sad. As discussed above, the troopers gave Pulido-Aguilar his *Miranda* rights between the first two custodial interrogations.

After considering all the circumstances, I see no evidence that Pulido-Aguilar gave any of the confessions involuntarily. The government has established the voluntariness of both the pre- and post-warning confessions by a preponderance of the evidence.

The final question, then, is whether Pulido-Aguilar knowingly and voluntarily waived his *Miranda* rights before confessing to his involvement in the drug trafficking. Pulido-Aguilar argues that because of the troopers' lack of familiarity with Spanish, they could not ascertain if he understood his rights and agreed to waive them.

Before law enforcement officials may question a suspect in custody, the officials must inform the suspect that he has a right to remain silent, that his statements may be used against him in court, that he has the right to the presence of an attorney, and that if he cannot afford an

PAGE 20 - OPINION AND ORDER

attorney, one will be appointed for him prior to questioning.  Miranda v. Arizona, 384 U.S. 436,

479, 86 S. Ct. 1602 (1966).  A valid waiver of *Miranda* rights must be knowing and voluntary

and can be express or implied.  Berghuis v. Thompkins, __ U.S. __, 130 S. Ct. 2250, 2260-61

(2010).  A waiver must be "voluntary in the sense that it was the product of a free and deliberate

choice rather than intimidation, coercion, or deception, and made with a full awareness of both

the nature of the right being abandoned and the consequences of the decision to abandon it."  Id.

at 2260 (internal quotations omitted).  The government must prove by a preponderance of the

evidence that a suspect validly waived his *Miranda* rights.  Colorado v. Connelly, 479 U.S. 157,

168, 107 S. Ct. 515 (1986).

I first note that I accept Trooper Raiser's testimony that Pulido-Aguilar indicated by

saying "yeah" that he understood his rights and waived them.  The trooper was able to see the

body language Pulido-Aguilar used during the interchange.  The two had been communicating

for several hours.  The conversation in which Trooper Raiser gave Pulido-Aguilar his *Miranda*

rights was relaxed.  There is no evidence of any intimidation or coercion at that time or at any

time during the entire traffic stop.  Pulido-Aguilar read all of his *Miranda* rights from a card

explaining the rights in Spanish.  Neither trooper said anything to Pulido-Aguilar to disparage the

importance of the rights.  I conclude that the government has proven by a preponderance of the

evidence that Pulido-Aguilar validly waived his *Miranda* rights.

In summary, because of the conceded *Miranda* violation, I suppress all statements

Pulido-Aguilar made between his arrest for false information and when he read his *Miranda*

rights after the drug arrest.  All statements Pulido-Aguilar made after waiving his *Miranda* rights

are not suppressed and can be admitted in the government's case in chief.

PAGE 21 - OPINION AND ORDER

IV.    <u>Search Warrant</u>

Pulido-Aguilar argues that the affidavit used to obtain the search warrant is heavily

dependant on the fruits of the illegal traffic stop.  He claims that if the fruits of the stop are

deleted from the affidavit, it does not support probable cause to search.

Deleting the suppressed statements from the warrant affidavit removes only two

sentences and makes no difference as to whether the warrant is based on probable cause.

**CONCLUSION**

Defendant's Motion to Suppress Physical Evidence and Statements [24] is granted in part

as explained above.

IT IS SO ORDERED.

Dated this _____20th_____ day of June, 2011.


_____/s/   Garr M. King___
Garr M. King
United States District Judge